EULALIÀ LEBRÓN CRUZ, Plaintiff and Appellee, *v.* HEIRS OF CARLOS YAPOR ELÍAS, Defendants and Appellants.

No: R-62-41.     Decided April 13, 1964.

*Luis A. Archilla Laugier* for appellants. *G. Cruzado Pujols* and *V. M. Fernández* for appellee.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

Carlos Yapor Elías, a Dominican citizen residing in the United States, married Eneida Gallardo in that country on September 11, 1954. Of this marriage, Wesley Yamil Yapor Gallardo was born on July 3, 1955.

From the fall of 1955, until March 30, 1961, Yapor Elías and Eulalia Lebrón Cruz, a Puerto Rican, who was not married, engaged in marital relations, of which relations four children were born. The first one, named Aracelis, was born in Jersey City in the State of New Jersey, on June 2, 1956.

On February 25, 1957, the divorce of Carlos Yapor Elías and Eneida Gallardo was decreed.

On June 26, 1957, Mildred, the second child, was born in the city of Chicago, State of Illinois. That same year, together with their two small children, Carlos and Eulalia moved to Puerto Rico and went to live in Río Piedras, but finally established their regular and permanent domicile in the city of Bayamón.

On August 14, 1959, while residing in Río Piedras, Janet, the third child, was born.

At the request of Yapor Elías, made in Puerto Rico, a Canadian insurance company, The Crown Life Insurance Company, issued an insurance policy on February 8, 1961, for $40,000 on his life with double indemnity in case of death caused by external, violent, and accidental means. At his request, the following designation of beneficiaries was made therein: "One eighth to Wesley Yapor Gallardo, one fourth to Aracelis Yapor Lebrón, one fourth to Mildred Yapor Lebrón, one fourth to Janet Yapor Lebrón (Children of the Insured) and one eighth to Emilia Elías (Mother of the Insured)."

On March 1, 1961, the fourth and last child, named Irma, was born in Bayamón, and her birth was recorded in the Bureau of Vital Statistics by Carlos Yapor Elías as his child. Shortly thereafter, that is, on March 30, Carlos Yapor Elías met a tragic death in Bayamón.

On August 16, 1961, Eulalia Lebrón Cruz, as mother with *patria potestas* over her children Aracelis, Mildred, and Janet, filed in the Superior Court, San Juan Part, an action of filiation agains the minor, Wesley Yamil Yapor Gallardo, as sole and universal intestate successor of his father, Carlos Yapor Elías. The former, represented by his mother, Eneida Gallardo, answered the complaint denying all its allegations and setting up the following defense:

". . . that the status of Aracelis Lebrón as well as of Mildred Lebrón is that of adulterine children pursuant to the Law of their birthplace, for which reason they cannot be acknowledged as a question of law."

On December 21, 1961, the case was called to be heard on its merits. At that hearing the parties, with the approval of the trial court, orally stipulated and accepted the facts set forth at the beginning of this opinion, mainly that Carlos Yapor Elías and Eulalia Lebrón had lived in concubinage since 1955, of which relation the children, Aracelis, Mildred, Janet and Irma, were born in the above-mentioned cities and dates, respectively and that on the date of his death Carlos Yapor had established his domicile (together with Eulalia Lebrón and his four children) in the neighboring city of Bayamón.

On the basis of the facts thus accepted as true, the case was submitted in order to determine which was the applicable law either to grant or to refuse the right to the status of children of Carlos Yapor Elías of the children Aracelis and Mildred, that is, whether the laws in force at the time of their respective births in the States of New Jersey and

Illinois should govern or the law then in force in Puerto Rico.

On February 2, 1962, the trial court entered its decision. It determined that the Puerto Rican law was applicable and decreed the filiation of both—Janet's also—with respect to Carlos Yapor Elías, for all legal purposes.

Appellant contends that the trial court "erred in deciding that the applicable law for plaintiffs' acknowledgment was the Act of May 12, 1942, an Act of Puerto Rico, and not the laws of the States of New Jersey and of Illinois.[1]

In his very short brief appellant only refers us to a certain part of a paragraph of the case of *Orama et al.* v. *Oyanguren*, 19 P.R.R. 788 (1913), in which it is held that an action for acknowledgment brought by the child is his own personal right governed by the law under which it was acquired and that the civil status of citizens can be determined pursuant "to the law of the country of the person

---

[1] On the date Aracelis was born in Jersey City—June 2, 1956—the legislation of the State of New Jersey afforded no remedy to the child of a married father and an unmarried woman to obtain a judgment declaring it to be its father's child "entitled to bearing his surname and all other rights corresponding to children" as decreed by the San Juan Court. From our examination of said legislation we know that there, a child born out of wedlock may be legitimized only by the subsequent marriage of its parents and the recognition and treatment as such child by them and that the mother, either while pregnant or after the child's birth, may bring an action of a quasi-criminal nature in which it shall be decided—under the rule of strong and convicing evidence—whether the person designated by her is the father of the nasciturus or of the child already born, and in an affirmative case, an order of filiation shall be entered in which it is specified the weekly sum to be paid by the father for the support of the child or to the mother during pregnancy, if she is in indigent circumstances. *Cf.* New Jersey Statutes Annotated, Permanent Ed., West Pub. Co., Title 3A, §§ 4–7, and Title 9, § 17–12.

Neither on the probable date of Mildred's conception in Chicago, nor on her birth date there—June 26, 1957—did the legislation of Illinois give any right to the action previously referred to. *Cf.* the annotated statutes of that State. Ill. Rev. Stat. Ch. 3, § 163. See the interesting historical development of this aspect of Family Law in States where the Anglo-Saxon Common Law has prevailed, in *Hardesty* v. *Mitchell*, 302 Ill. 369, 24 A.L.R. 565.

who brings the action." But, for more than half a century such has been the law and prevailing doctrine in Puerto Rico on this question.[2]

Under what law or laws did Aracelis and Mildred acquire the right to claim their filiation? Notwithstanding that the former was born in the State of New Jersey in 1956 and the latter in Illinois, in 1957, we are of the view that they acquired it under the Puerto Rican law. Inasmuch as their father, Yapor Elías, had not recognized them juridically as his children, and had not married Eulalia Lebrón Cruz, nor had the relation of parent and child been judicially decreed between them, both girls' citizenship was the same as their aforesaid natural mother's, that is, Puerto Rican.[3] In that event, the mother, as well as her two daughters, while they resided in any of the States, were bound, pursuant to § 9 of our Civil Code, by "the laws relating to family rights and obligations, or to the status, condition, and legal capacity of persons."

By virtue of the regular and permanent residence of both girls in Puerto Rico since 1957 until August 1961 when the complaint was filed, their condition as Puerto Rican citizens domiciled in Puerto Rico is consolidated. Section 5a, Federal Relations Act, and § 10, Political Code. On the other hand, on the date Yapor Elías died, the latter had established his home in Puerto Rico, had accepted the particular system of life and of law of this country and his evident intention was to live here forever, drifting apart from the sphere of influence of the laws of his country of origin. See *Lókpez* v. *Fernández*, 61 P.R.R. 503, 520 *et seq.* (1943).

---

[2] See: *Martínez* v. *Widow of Martínez*, 88 P.R.R. 429 (1963), and cases cited in footnote 6.

[3] *Rodríguez* v. *García*, 34 P.R.R. 22, 25 (1925). The record fails to disclose whether on the respective birth dates of those two daughters or at any later time, their mother, who was unmarried, had acquired a new or different domicile from her domicile of origin, Puerto Rico.

In *Orama et al.* v. *Oyanguren*, 19 P.R.R. 788, 790–91 (1913), cited by appellants as an authority in support of their petition, we said:

". . . the action which may be brought by a child to secure by means of evidence a decree designating his natural father, is a personal right of his, therefore when the child is in possession of such right it should be governed by the law under which it was acquired and all matters concerning the status of the person should be governed by the law of the country of the person who brings the action. The civil status of citizens is governed entirely by the laws of their own country and can be determined only pursuant thereto. Consequently, although it is a general rule that a court does not acquire jurisdiction over non-residents in personal actions unless they have been summoned personally within the State or possess property therein which has been attached, nevertheless said general rule cannot be applied to cases which involve the civil status of the individual, within which is included an action of filiation, because it being a right originating by conception and birth such right cannot be subjected to the contingency that the alleged father or the legal representatives of his personality may have absented themselves from the country of the individual entitled to acknowledgment, considering that such right is not recognized in all countries and that in some countries evidence of acknowledgment is not admitted for the reason that it is deemed contrary to public order and good custom as there understood."

The conflict during those years, 1956 and 1957, between the laws of New Jersey and of Illinois and the law of Puerto Rico with respect to the rights of children born out of wedlock when their parents were unable to marry each other is evident. While here such children were given full rights and were juridically identified to children born of a legal marriage, the legislation of those States refused them.

However, the modern tendency in the majority of the legislatures and courts of American states under the Common Law is to lighten the harshness or severity of ancient

principles and doctrines of local law or of private international law which constituted unsurmountable barriers for local recognition of favorable effects for children born out of wedlock of laws of other jurisdictions, inspired on or developed under the private civil law system. A greater tolerance is observed with respect to the status of such offspring acquired under the law of their domicile of origin.[4]

---

[4] See the interesting annotation of Maryland Professor John W. Ester, *"Illegitimate Children and Conflict of Laws,"* published in 36 Indiana L. J. 163 *et seq.* (1960–61). With respect to the condition, rights, and manner of acquiring a status under the Anglo-Saxon common law principles, Professor Ester contends that American legislatures and courts have unanimously rejected the archaic doctrine embodied in the Statute of Merton, under which a child born out of wedlock was a bastard for life, did not inherit, was looked upon as the son of nobody, and was called "filius nullius" and sometimes "filius populi." That statute was approved by English nobility meeting in Parliament in the city of Merton, Surrey County, in the year 1235. The English Earls and Barons refused to change the laws of the realm, observed or approved until that time, refusing to improve, even if through the subsequent intermarriage of the parents, the condition of children born cut of wedlock. On the basis of that refusal, Lord Chief Justice Tindal, in *Birtwhistle* v. *Vardill,* 7 Eng. Rep. 1308, 1322 (1840), was able to state: ". . . the rule of descent to English land is, that the heir must be born after actual marriage of his father and mother . . . and that this is a rule of a positive inflexible nature, applying to and inherent in the land itself which is the subject of descent. . . ." Legitimation in England was granted under a statute called Legitimacy Act of 1926. But under the former state of law English courts invariably considered as useless or void any statutes of foreign countries giving certain status, rights, privileges, and relief to such offspring.

According to Ester, at present the most common situations where a child born out of wedlock may not receive a favorable treatment as such, in certain American forums—which he considers unjustifiable and partly due to the failure of the courts to properly assimilate the concept of recognized natural child of the civil family law into standards established by the English common law—are: (1) where the policy or practice of the forum is contrary to the law of the jurisdiction in which the status was acquired; (2) where the foreign law solely and exclusively resulted in the creation of a right to inherit and not a status of full legitimacy for all legal effects, and (3) where the child has become a recognized natural child in a civil law jurisdiction.

The final words of that annotation are, literally, as follows:

"In regard to the third area of possible unfavorable treatment in the forum, that of the recognized natural child, the difficulty is based on the failure of the courts to properly assimilate this civil law concept into

■ These children, Mildred and Aracelis, having acquired a Puerto Rican domicile by origin and by law, notwithstanding that the former was born in the State of New Jersey and the latter in the State of Illinois, all of our laws relating to family rights and obligations, and to the status and capacity of persons referred to in the aforesaid § 9 of our Civil Code and laws with respect to personal property pursuant to § 10 of that same Code, are applicable to them. It is no longer necessary to say that beginning July 25, 1952, here all children, in general, enjoy the same rights for all legal purposes.[5]

Even in the hypothetical case that their domicile of origin had been in New Jersey and in Illinois, respectively, inasmuch as the State has a primary interest in the father and child relation[6] and both being, at the time the litigation began, citizens of Puerto Rico, domiciled here, as was their mother, and likewise their father, and since under Puerto Rican legislation in force at the time of their respective births both had a clear right to claim the status of daughters of Yapor Elías for all legal purposes, we can hardly think of a good reason to apply here the New Jersey and Illinois legislation to which they were never subject with respect to their family rights and which is contrary to and in irreconcilable conflict with our laws.

■ Since the fact itself of the paternity of these minors is not in issue, by virtue of our constitutional provisions the

---

the established common law pattern. Admittedly, such a child is neither illegitimate nor has he been legitimated. But the status which he has acquired is most closely akin to the common law concept of the legitimated child, and he should be granted the rights of such a child when before the courts of this country."

[5] As of that date the juridical institute of legitimation by the subsequent marriage, for all practical purposes, lost its usefulness in Puerto Rico. The constitutional and statutory equality of rights enjoyed here by any child protects even that child who used to be called "incestuous," whose parents were absolutely unable to marry each other.

[6] *Guerra* v. *Ortiz*, 71 P.R.R. 574, 577 (1950).

courts in Puerto Rico are precluded, pursuant to the legislation of other States in conflict with ours, from passing on the condition of daughters of the plaintiffs.

The judgment rendered by the San Juan Part of the Superior Court on February 2, 1962, declaring for all legal purposes, plaintiffs-appellees, Aracelis, Mildred, and Janet Lebrón, children of Carlos Yapor Elías, deceased, will be affirmed.